IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-00227-WJM
Civil Case No. 23-cv-01621-WJM

**UNITED STATES OF AMERICA**,

Plaintiff-Respondent,

v.

**ZEBBODIOS DEJUAN HALL**,

Defendant-Petitioner.

_____

**REPLY IN SUPPORT OF MOTION TO VACATE**
_____

Mr. Hall submits the following in Reply to the Government's Response to his Motion to Vacate filed herein pursuant to 28 U.S.C. §2255.

**FACTUAL BACKGROUND**

For a century, the FBI has covertly surveilled, harassed, intimidated, politically prosecuted and, at times, extrajudicially murdered Black Americans of all political persuasions.[1] This meticulously researched, and historically documented phenomenon has recently targeted Black Live Matter (BLM). Through careful work by several investigative journalists, we now know that these anti-Black FBI elements trained their sights on Zebbodios Hall, a mentally ill and intellectually disabled Black man. The FBI's man for this job was Mickey Windecker, a violent felon and sex offender who infiltrated Black organizers in Denver to surveil, disrupt, and entrap Black activists, all while

---

[1] https://library.uncw.edu/eresources/federal_surveillance_african_americans#:~:text=Black%20Americans%20of%20all%20political,were%20originated%20by%20such%20operatives.

escalating violence to create arrests and prosecutions in response to alarmist, unsupported rhetoric from right-wing factions. On these orders, Windecker tagged Hall and another activist, Bryce Shelby. After casually suggesting the two might enlist his help to "blow up a motherfuckin' courthouse," he pressured Shelby to take part in a plot to murder Colorado Attorney General Phil Weiser. When Shelby refused and cut off all communication with Windecker, he was rewarded by local prosecutors, who used undercover recordings to convince a judge to seize Shelby's lawfully owned firearms under Colorado's red flag law. Finding little support for his assassination plot, Windecker began his campaign to enlist Hall to buy a firearm. Meanwhile, left-wing organizers across the state – including Hall – began voicing suspicions about Windecker's loyalties. In response, Windecker took to YouTube and, with an assault rifle positioned behind him, issued death threats to the people who suspected him of being exactly what he was: a snitch and an agitator.

> "This propaganda shit you guys posted doesn't mean fuck all to me … But understand this: I will be polite and professional, but **I have a plan to kill everyone in the fucking room if need to be**."[2]

Of course, it was precisely this reputation for violence and intimidation that made Windecker attractive to the FBI in the first place. That reputation was at the forefront of Hall's mind when Windecker told him to buy him a gun. Hall would later tell reporters: "I was just afraid of him," Hall explained. "I was fucking terrified of this guy."[3] Seeing no way out, Hall relented rather than face violent retribution. Nearly a year later, after Windecker had long gone from Colorado, federal agents arrested Hall. Without resources to hire

---

[2] https://www.youtube.com/watch?v=PgezMO0m4xg.
[3] https://theintercept.com/2023/02/07/fbi-denver-racial-justice-protests-informant/.

2

counsel, he was assigned a public defender who told Hall he had no viable defense. The record does not show that this public defender made any attempts to fully investigate the possibility of an entrapment defense, outrageous Governmental conduct arguments, or *Brady/Giglio* violations. On this advice, Hall pled guilty to Transfer of a Firearm, in violation of 18 U.S.C. § 922. He was sentenced to 3 years' probation. On June 26, 2023, Hall filed a Motion to Vacate or Set Aside his sentence, raising three claims: Ineffective Assistance of Counsel, Prosecutorial Misconduct, and Outrageous Governmental Conduct. On July 26, 2023, the Government responded and attempted to refute all three claims.

### I.   Counsel's unreasonable failure to advise Hall about the strength of his entrapment defense was ineffective lawyering that prejudiced Hall.

To demonstrate ineffective assistance, the petitioner must show that counsel's performance fell below an objective standard of reasonableness, and that the deficient performance was prejudicial. *Strickland v. Washington,* 466 U.S. 668 (1984). A foundational principle of effective assistance is the "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. The duty to investigate arises "because reasonable effective assistance of counsel must be based on **professional decisions**[,] **and informed legal choices can be made only after investigation of options**." *Id.* at 680. the duty to investigate is necessary "to make the adversarial testing process work in the particular case." *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997). Conversely, the decision not to investigate is not reasonable if it is uninformed. *Heard v. Addison*, 728 F.3d 1170, 1180 (10th Cir. 2013). In this case, defense counsel failed to investigate an entrapment defense fully and effectively, and how Hall's mental health disabilities made him especially vulnerable to inducement and coercion by a violent and intimidating

3

Government Agent, Michael Windecker. But for counsel's unreasonable lack of investigation, Hall could have successfully raised entrapment at trial. Because counsel failed to fully investigate entrapment, they were unable to effectively advise Hall during the plea-bargaining process. Had Hall been fully advised of the viable entrapment defense that a full investigation would have revealed, Hall would have rejected the offer and gone to trial.

### a. Hall had the right to effective lawyering during plea-bargaining process.

The accused's Sixth Amendment right to counsel "extends to the plea-bargaining process." *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). To show prejudice resulting from ineffective plea-bargaining, a defendant must demonstrate "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lafler*, 566 U.S. at 163. In the context of a guilty plea, the prejudice prong requires "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty" and insisted on trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). "Reasonable probability" means a probability sufficient to undermine confidence in the outcome and is "somewhat lower" than a preponderance of the evidence. *Strickland*, 466 U.S. at 694.

The fact of Hall's strong affirmative defense was crucial information for weighing the risks of trial versus a plea. Hall was an activist whose trial could have not only resulted in acquittal, but could have also shone light on gross, racialized Governmental misconduct (described *infra*). There is every reason to conclude that, had Hall been aware of his strong entrapment defense, he would have opted for trial, and thus there was more than a reasonable probability that he would not have pleaded guilty.

This undermines confidence in the outcome. *Strickland*, 466 U.S. at 694.

### b. There is no evidence in the record that pleading was strategic.

The Government claims, without support from the record, that all of counsel's actions amounted to strategy. However, had counsel acted reasonably and investigated key aspects of their case, they would not have saved that information for a sentencing when it could have allowed them to prevail at trial. But even if the Government could somehow establish that foregoing full investigation in favor of pleading was "strategic," the decision was not reasonable. In order to be reasonable, an attorney's decisions must be informed, "and informed legal choices can only be made after investigation of options." *Strickland*, 466 U.S. at 691, 680. Because counsel failed to conduct a thorough investigation into an entrapment defense, they were *unable* to make informed, strategic decisions about a plea bargain or trial and consequently, Hall was ill-advised to plead. For entrapment, the accused must present some evidence that he was induced to commit a crime by a Government agent; and not otherwise predisposed to commit the crime. *United States v. Mathews*, 928 F.3d 968 (10th Cir. 2019). Inducement is "government conduct which creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." *United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir. 1986). "[It] may take the form of 'persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship.'" *Id.* (quoting *United States v. Burkley*, 192 U.S. App. D.C. 294, 591 F.2d 903, 913 & n. 18 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 966 (1979)). Further, the Tenth Circuit's Pattern Jury Instructions provide a defendant was entrapped if: (1) the idea for committing the crimes *originated with Government agents*; (2) Government agents *then persuaded defendant into committing the crime*; and (3) defendant was *not already willing*

5

*to commit the crimes*. § 1.27 (Ed. 2021). Hall clearly meets this standard. Under the first prong, the Government does not dispute that Windecker asked Hall to purchase the weapon. Nor can it dispute that Windecker was a Government agent. *Sherman v. United States*, 78 S. Ct. 819 (1958). The Government correctly notes that it is not enough to show that a "government agent initiated the contact . . . or proposed the crime." *United States v. Nguyen,* 413 F.3d 1170 (10th Cir. 2005). However, the Government contends Hall showed nothing more than Windecker initiating and proposing the crime by mischaracterizing conversations between Hall and Windecker. It quotes portions of these conversations where Hall agrees to purchasing the firearm. (ECF, Doc.#49-1). However, what the Government omits is the fact that Windecker told Hall he needed a weapon *at least five separate times* prior to Hall's capitulation. Additionally, during this conversation, Windecker stated, "his fee is an AK," and continues to state that he cannot help Hall in his cause without getting "what I need." (*Id.,* p.17) Further, throughout the entire conversation, prior to Hall agreeing to purchase the gun, Windecker continually discussed his violent abilities, such as blowing stuff up, shooting guns, and mind manipulation techniques performed on terrorists. (*Id.*) Thus, the Government's own evidence highlights Windecker's persistent badgering, coupled with his violent tendencies and extreme tactics, which illustrate how he persuaded, coerced, and induced a mentally comprised an intimidated Hall into unlawfully purchasing a firearm for him. The Government further contends that, because Hall desired "military-style training" and ultimately relented to the purchase, he was predisposed to the crime.

The Government makes this circular conclusion without reference to the actual definition of predisposition. Predisposition is defined as "*inclination* to engage in the illegal

6

activity" and "focuses on the defendant's state of mind *before*" the agent's suggestion. *United States v. Ford*, 550 F.3d 975 (10th Cir. 2008); *United States v. Scull*, 321 F.3d 1270, 1276 (10th Cir. 2003). Tenth Circuit juries are routinely instructed that relevant factors for determining predisposition include whether the defendant previously engaged in the illegal activity, his desire for profit, his eagerness to participate, his ready response to the agents' offer, or his demonstrated knowledge or experience in the criminal activity. *E.g., United States v. Greenwood*, 2018 U.S. Dist. LEXIS 124827, *39; *United States v. Corber,* No. 04-40003-01-SAC, 2005 WL 272983 (D. Kan. Jan. 27, 2005).  Based on these definitions and factors, Hall was in no way predisposed to this crime. He has no prior involvement or experience in purchasing firearms; in fact, he had no significant criminal history whatsoever before Windecker's coercion. The Government can point to no profit motive whatsoever, and Hall clearly demonstrated no eagerness to purchase the weapon, as Windecker had to solicit it no less than five separate times. Hall further demonstrated no knowledge or experience of purchasing weapons because he did not even know where or how to do so. Windecker had to walk him through the entire process. Rather than criminal disposition, Hall's mental disabilities and abject fear explain why he was willing to purchase that firearm. Neither is Mr. Hall's desire for "military-style training" evidence of criminal predisposition. Countless law-abiding citizens seek tactical training for a host of innocent, self-defense reasons. The Government's own Exhibit shows Hall's primary motivation in seeking "military training" for himself and others was self-defense.

> "[N]ot only do I want to take **my own self-defense** but I want people to be military trained. You know, armed resistance … like the things that happened yesterday. Um, **I don't want them to go out right and kill these people** … We get people that are going to train them how to use guns, and you know make explosives and everything. **We have to be able to defend ourselves** … **we need to know every bit of defense possible**."

7

(ECF Doc.#49-1, p. 8) As shown, Hall's desire for training is further evidence of *fear* for his and others' safety, not criminality. Hall had a strong entrapment defense and hard-hitting evidence that could have demonstrated he was both induced and not predisposed. Thus, the failure to investigate it was not reasonable on the part of his defense counsel.

### c. Competent investigation into Hall's mental health would have strengthened his entrapment defense.

Hall's mental-health history began at age ten, when he was diagnosed with ADHD and prescribed Ritalin. Approximately three years later, he was diagnosed with depression and prescribed Zoloft. By age twenty, he was experiencing auditory and visual hallucinations, mania, and suicidal ideations. (ECF Doc #42-6, p. 3). Presently, he takes four different medications to treat schizoaffective disorder, bipolar type; post-traumatic stress disorder; and ADHD. (ECF, Doc. #42-3). As detailed in Dr. Peters' 2017 evaluation report, much of Hall's present suffering traces to a childhood marked by neglect, abandonment, and abuse, including emotional, physical, and sexual mistreatment. (ECF Doc.#42-6, pp. 1-2). He battles deficiencies with respect to "effective intrapsychic regulation and acceptable interpersonal conduct," and, as a result, he presents as "[t]imid, shy, and apprehensive." (*Id*. p. 10). Dr. Peters noted "the presence of a prominent anxiety disorder" and "his overall personality makeup [as] pervasive social disquiet, behavioral edginess, apprehensiveness over small matters, and worrisome self-doubts." *Id*. p. 11.

Perhaps most alarmingly, Dr. Peters noted:

> a recent **psychotic episode** marked by periods of regressive behavior, physical impassivity, and the shutting down of emotional expression and behavioral initiative. Quite possibly a phase in an extended or recurrent **schizophrenic pattern**, these periods probably signify efforts to **deflect unexpected social pressures or anxieties**.

8

*Id.* (emphasis added).

Small wonder that a gratuitously violent social miscreant homed in on this weakened individual as his prey. In support of its contention that counsel must have conducted adequate investigation into Hall's complex psychological and psychiatric needs, the Government cites to counsel's vague statements about "long-standing diagnosed PTSD" and a TBI in her sentencing statement filed at ECF Doc. #32. Missing from that Statement, however, is any mention of Hall's Schizoaffective Disorder – Bipolar Type, a DSM-V Axis I severe and persistent mental illness that can impact a person's grasp on reality. Indeed, counsel did demonstrate *some* degree of awareness with respect to *some of* Hall's mental-health conditions. They even started to perceive how such deficiencies "played a not insignificant [*sic*.] role in … combin[ing] to make Mr. Hall uniquely vulnerable and susceptible to being used or manipulated by others." (ECF Doc.#32, p. 8) But this proves merely that counsel knew of *some* deficiencies at some unknown level. "Some awareness" is in no way tantamount to a thorough, zealous investigation into avenues for acquittal. Counsel may have gotten the ball rolling, but they failed entirely to follow through with a full investigation, and thereby failed to connect the dots for a viable entrapment defense. A defense about which, at the very least, Hall should have been fully advised.  Without a shred of scientific or medical authority, the Government further asserts that Hall's mental infirmities amount merely to difficulty understanding new information, and thus is not relevant to the issue of entrapment. (ECF Doc. #49, p. 8) Contrary to this baseless assertion, courts routinely rule mental-health evidence relevant to the entrapment defense. In *United States v. Mosely*, the court ruled that a head injury, changed personality, and resulting tractable tendencies are relevant to

9

the issue of predisposition. 496 F.2d 1012 (5th Cir. 1974). Similarly, in *United States v. Sandoval-Mendoza*, the court held that evidence of a medical condition rendering a person especially vulnerable is highly relevant to entrapment. 472 F.3d 645 (9th Cir. 2006). It is likely that Hall's head injury, mental health disorders, medications, and attempted suicides rendered him acutely vulnerable to persuasion, inducement, and manipulation. Furthermore, the Government's bald assertion about the repercussions of Hall's mental-health diagnoses has the effect of conceding the need for a hearing. In *United States v. Fields*, the Tenth Circuit reversed the district court's denial of an evidentiary hearing, finding the district court erroneously resolved the issue of prejudice "because there was a **genuine issue of material fact** regarding whether an individual, such as the inmate, could have organic brain damage that was revealed by neuropsychological testing, but that did not otherwise appear on an MRI of the brain." 949 F.3d 1240, 1256 (10th Cir. 2019). In *Fields*, as in this case, the parties disagreed on the meaning and interpretation of certain mental-health evidence. Because nothing in the record could conclusively resolve that issue of material fact, the Tenth Circuit concluded that an evidentiary was needed. *Id*. The Government also concedes counsel at least was aware of Hall's conditions. They therefore had a duty to investigate their application to entrapment. As such, counsel's inaction was unreasonable, and therefore ineffective and prejudicial to Hall.

### d. Competent investigation into Windecker's violent and coercive tactics would have strengthened Hall's entrapment defense.

Counsel also failed to investigate how Windecker's violent behavior and reputation bolstered the entrapment defense. In assessing predisposition, courts scrutinize the nature of Governmental inducement. *E.g., United States v. Smith*, 802 F.2d 1119, 1124-

25 (9th Cir. 1986); *United States v. Reynoso-Ulloa*, 548 F.2d 1329, 1336 (9th Cir. 1977), *cert. denied,* 436 U.S. 926 (1978). Investigation into Government agent Windecker would have shown his longstanding reputation for violence, which, coupled with his badgering and belligerent behavior, is further evidence of entrapment of Hall. The Government again defends this failure by highlighting that counsel used this information at sentencing. Again, this is no justification. There is no authority for the contention that abandoning investigation of a trial defense is strategic if the basic information is used at sentencing as mitigation, and simply there is no logical reason why such information could not be effectively used for both purposes. Further, connecting Windecker's violent behavior to Hall's vulnerabilities establishes how Hall was not predisposed to commit this crime. This fact was heartbreakingly underscored at sentencing, where Hall shared about the sense of love and security, he derived from joining a jiujitsu program. He shared that when he misses training sessions, his friends in the program reach out. "Someone actually loves me … And it just feels good that these people love me. So, yeah, I'm sorry that I'm – I've never done this before, but it just feels good to be loved." (ECF Doc.#49-3, pp. 25-26)

Insightfully, this Court expressed puzzlement over the entire situation:

> One of the things that puzzles me about this case is that you really have a very minimal history -- criminal history. I mean, you have -- I think there were two or three [traffic offenses] and your only other actual criminal conviction was a misdemeanor conviction for … less than half an ounce of marijuana over 15 years ago. So you went through a very long stretch where you had no issues … with respect to the law. You of course had the other [mental health] issues going on in your live that we've referenced … but **what all of a sudden triggered this change in your actions that brought the criminal justice system back into your life?**

*Id*. pp. 25-26.

Hall struggled to articulate his answer but made passing references to a "lack of self-love," "wanting to be wanted," "fear," and "just [being] scared." *Id*. pp. 26-27. The

11

Court further inquired of Hall, "Did [Windecker] intimidate you into buying it? Were you scared of him if you didn't buy it for him?" Hall responded, "In some ways, yeah."  The answer was simple enough. What all of a sudden triggered Hall's actions that brought the consequences of a felony conviction into Hall's life? Windecker. But this Court need not rely on Hall's assessment alone. In a letter attached to the initial pleading as ECF Doc.#42-5, Mr. Trey Quinn recounts how his protest movement was "targeted by Law [*sic*.] enforcement and engaged by Michael Windecker," whose "role in the protest was that of an accelerationist." He describes how Windecker, "with a car full of firearms" and "tout[ing] his ability to reach violence at the flick of a switch," would actively attempt to "push all events to violence" and influence "unwilling protestors into further vandalism." He recalls how Windecker targeted Hall, attempting to "groom" him, "manipulate" him, and even making a "threatening speech" that placed Hall in danger. Quinn concludes, "In my opinion, when a man with a car full of weapons make you, his enemy things can change in your mind drastically. It is my belief that Zebb [Mr. Hall] feared for his life in his dealings with Mickey [Windecker.]"  Yet the Government would have this Court believe Hall was predisposed to buy weapons for a violent man who publicly aired death threats to those whom he deemed disloyal. The reality is that Hall was mentally ill, intellectually disabled, and therefore particularly vulnerable. Windecker caught scent of Hall's deficiencies and vulnerabilities, and badgered and intimidated him into compliance, all for the purpose of sowing confusion and chaos among Denver's Black organizers, including having them commit crimes for which they could get arrested and convicted, like Hall. Instead of aggressively investigating this gross abuse of power, counsel faltered and allowed it to run rampant, leaving Hall, another Black man with a felony. An effective

defense attorney would have aggressively investigated the paid Government informant who targeted their mentally ill client based on political persuasion.

### e. Hall was prejudiced.

In the context of a guilty plea, the prejudice prong of *Strickland* requires the defendant to "show that he would not have pled guilty had his attorney performed in a constitutionally adequate manner." *Miller v. Champion*, 262 F.3d 1066 (10th Cir. 2001). "Incorporated and subsumed" into the prejudice standard is a requirement that the defendant show "that his decision to reject the plea would have been rational under the circumstances. *United States v. Dominguez*, 998 F.3d 1094 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 2756 (2022). The Government argues it would have been irrational for Hall to decline the plea offer because he would have faced a sentencing range of 15-21 months at trial. But with a strong entrapment defense, rejecting the plea and not going to trial would not have been irrational. Because an entrapment defense would have likely succeeded, all detailed *supra*, Hall would not have a felony conviction attached to him for the rest of his life. The Government further argues, baselessly, that Hall was not prejudiced by his counsel's decisions because had they investigated further, it would not have changed the recommendation to take the plea and forgo trial. There is simply no proof that counsel would have given Hall the same advice had they made themselves aware of the facts supporting a strong entrapment defense. Perhaps counsel would testify as to their mindset and reasoning, but that information is outside the record.

## II. Government failed to disclose the extent of Windecker's role as Government informant and agitator.

Hall's conviction is further tainted by the Government's violation of his due process right to exculpatory evidence. "[S]uppression by the prosecution of evidence favorable to

13

an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83 (1963). The Government had extensive knowledge regarding Windecker's history of violence, wrongdoings, and criminal convictions, including felonies and sexual assault. Not only did the Government intentionally withhold the extent of Windecker's role as an informant, but the Government also specifically placed Windecker in a role for the sole purpose of interrupting the First Amendment activities of the Black Lives Matter social justice movement. Thus, the Government not only condoned entrapment, but they sanctioned it. This is not just a "weird guy" as argued at sentencing.

Despite the Government's assertion to the contrary, Hall's prosecutorial misconduct claim is not procedurally defaulted. They claim that even if Hall's prosecutorial misconduct claim had merit, it is not allowed due to the plea deal he entered. However, that is the exact issue that Hall's motion stems from, ineffective assistance of counsel for failure to adequately advise him on all viable defenses at trial before pleading guilty.

### III. Government obtained Hall's conviction through outrageous Governmental misconduct.

Hall's conviction should be vacated because it was the direct result of outrageous Governmental misconduct. The outrageous conduct defense is an outgrowth of the entrapment doctrine and shares some similarities. *United States v. Russell*, 411 U.S. 423 (1973). While entrapment focuses on the defendant's readiness to commit crimes, the outrageous conduct defense focuses on the Government's conduct. *Mosley,* 496 F.2d 1012. "[T]he cases on outrageous conduct suggest two factors that form the underpinnings for most cases where the outrageous conduct defense has been upheld: Government creation of the crime and substantial coercion." *Id*. In order to prevail, the

14

defendant must show that the challenged conduct violated notions of fundamental fairness and is shocking to the universal sense of justice. *United States v. McKissick,* 204 F.3d 1282 (10th Cir. 2000).

### a. The Government's involvement was excessive in the creation of the crime.

Typically, an informant is one who provides information to law enforcement to investigate a crime. Windecker was hired to instigate, agitate, and invent crime, not just to solve it. The FBI assigned this violent felon to the BLM movement for the very purpose of inciting disturbances and creating criminal activity. Windecker went far beyond just suggesting criminal activity, he cajoled Hall into committing the crime and educated him as to how to go about committing it, and intimidated and convinced him to go through with it. Along the way, he publicly aired death threats against anyone who even *suspected* him of being an informant. Hall had no predisposition to commit this crime charged, has no history of violence or of even *lawfully* purchasing or using firearms, much less purchasing them feloniously. Without suggestion, and constant pressure from Windecker, Hall would not have committed this crime.

## CONCLUSION

The record herein fails to conclusively establish that counsel's performance fell with the range of reasonable professional assistance under the Sixth Amendment and the pleadings and exhibits filed herein demonstrate the need for an evidentiary hearing.

Dated: October 25, 2023.

Respectfully submitted,
s/Lisa A. Polansky
Lisa A. Polansky, Attorney at Law
Polansky Law Firm, PLLC
4999 Peal East Circle, Suite 201
Boulder, Colorado 80301
lisa@polanskylawfirm.com
(303) 415-2583

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2023, I electronically served the foregoing on the following party via CM/ECF:

United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202

s/Lisa A. Polansky